# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DRAVO BAY LLC D/B/A BLUE ROCK FINANCIAL GROUP,<br><br>     Plaintiff-Counterclaim<br>     Defendant,<br><br>     v.<br><br>JAMES WHALEN,<br><br>     Defendant-Counterclaim<br>     Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   C.A. No. 2025-0355-SEM<br>)<br>)<br>)<br>)<br>)<br>) |

Date Submitted: February 6, 2026
Date Decided: March 10, 2026

## <u>MEMORANDUM OPINION[1]</u>

R. Eric Hacker, Melissa A. Lagoumis, MORRIS JAMES LLP, Wilmington, Delaware; *Counsel for Plaintiff-Counterclaim Defendant Dravo Bay LLC d/b/a Blue Rock Financial Group*

Judith M. Jones, GIORDANO & GAGNE, LLC, Wilmington, Delaware; David F. McComb, ZARWIN BAUM DEVITO KAPLAN SCHAER & TODDY, P.C., Philadelphia, Pennsylvania; *Counsel for Defendant-Counterclaim Plaintiff James Whalen*

**MOLINA, Senior Magistrate**

---

[1] In their pretrial stipulation, the parties agreed to waive their right to seek further judicial review of my final decision under Court of Chancery Rule 144. *See* Docket Item 91 at ¶ 57. Thus, I am issuing my ruling as a memorandum opinion which shall have the same effect as a decision of the Chancellor or Vice Chancellors and is subject to the same procedural and substantive review of that of the Chancellor or Vice Chancellors.

The employee in this employment-related dispute blatantly breached his restrictive covenants and misused his former employer's trade secrets. His attempts to avoid liability and shift blame through a defamation counterclaim fail. In this post-trial ruling, I conclude that the employee should be assessed damages and held to his obligations through an extended restrictive term.

## I. BACKGROUND[2]

This employment-related dispute addresses the fallout after James Whalen (the "Defendant") left his employer "effective immediately," informed the employer's clients of his move, and succeeded in bringing some of his employer's clients with him to his new firm. I began with a bit about the parties before diving into the largely uncontested facts leading to our February 2026 trial.

### A. The Parties

In or around 2014, Todd Roselle founded Marathon GRP Events LLC ("Marathon") as a financial advisory and predecessor entity to Dravo Bay, LLC d/b/a Blue Rock Financial Group (the "Plaintiff").[3] Roselle, the sole owner of the Plaintiff,

---

[2] The facts in this report reflect my findings based on the record developed at trial on February 6, 2026, as well as those agreed upon by the parties in the joint pretrial stipulation. *See* Docket Item ("D.I.") 91 ("Pretrial Order"). Citations to the trial transcript are in the form "[Last name] Tr." referring to the testimony of the identified person. Defined parties are identified with that designation. The parties' jointly submitted exhibits are cited as "JX __." I grant the evidence the weight and credibility I find it deserves.

[3] Pretrial Order ¶ 9; Roselle Tr. 6:20–22.

is an experienced financial advisor who has been in the financial advisory and planning business industry for over twenty years.[4] His current business, the Plaintiff, is a Delaware limited liability company with its principal place of business in Delaware.[5] It operates as an independent financial services firm that provides comprehensive, customized financial advice and services to individuals and businesses based upon the clients' unique goals and objectives.[6]

The Defendant also has experience as a financial advisor. Before joining Marathon, the Plaintiff's predecessor entity, the Defendant was a registered advisor with Goldman Sachs. The Defendant was terminated from that position, however, when he "used a photocopied signature" against company policy.[7] Goldman Sachs reported that termination on a U5, FINRA reporting form (the "First U5"). "The Form U5 is a requirement whenever a registered advisor separates from an advisory firm for any reason: termination, voluntary. It's sort of like an exit disclosure to just speak from the departing employer's perspective what were some of the conditions or circumstances surrounding that exit. So it certainly gives a future employer some insight into the nature of that departure."[8]

---

[4] Roselle Tr. 5:20–23. JX20; Pretrial Order ¶ 6, 9.

[5] Pretrial Order ¶ 6.

[6] Pretrial Order ¶ 8; Roselle Tr. 6:5–7.

[7] Roselle Tr. 70:15–17.

[8] Jones Tr. 208:13–18.

In the First U5, Goldman Sachs disclosed the Defendant's termination and reasons therefor. Roselle was aware of the Defendant's termination and the First U5.[9] But he wished to work with the Defendant, nonetheless. Roselle was not the final decisionmaker, though, on whether Marathon could onboard the Defendant as an advisor. That was Cambridge Investment Research, Inc. ("Cambridge"), Marathon's broker-dealer.[10] Because Cambridge had other registered investment advisors with U5 form disclosures, it determined that the Defendant would be one too many and it refused to register the Defendant as an investment advisor.[11] Undeterred, Roselle went to bat for the Defendant and negotiated a non-investment advisor hiring.[12] Ultimately, Roselle decided that Director of Financial Planning was an appropriate title for the Defendant.[13] The Defendant, thus, joined Marathon in 2017 as the Director of Financial Planning, an administrative role.[14]

---

[9] Roselle Tr. 69:11-14. The Defendant brought this issue to Roselle's attention. Defendant Tr. 254:23–255:1.

[10] Roselle Tr. 70:21–22. The Cambridge relationship went away when Marathon transitioned into the Plaintiff. Roselle Tr. 8:1–4.

[11] Roselle Tr. 71:8–15.

[12] Roselle Tr. 15:1–3.

[13] JX27; Roselle Tr. 15:14–16.

[14] Roselle Tr. 10:1–4; *see also* Roselle Tr. 69: 8–10.

In May 2017, in connection with his hiring, the Defendant signed a Confidentiality and Non-Solicitation Agreement (the "Agreement"), which will be addressed in the analysis section below.[15]

## B.    The Business

With his non-advisory role, the Defendant did not bring a book of business with him. But he worked closely with Roselle and his clients and assisted the Plaintiff as it transitioned from Marathon into the Plaintiff.[16] In connection with that transition, Marathon was closed on December 31, 2018, and effectively cancelled on February 20, 2019.[17] With the transition, the Plaintiff was no longer under the Cambridge umbrella and the Defendant's role could evolve. He began to partake in Roselle's client meetings and eventually conducted some of those meetings on his own.[18] And he eventually took over the advisory role he had initially been denied.[19]

Through the relevant period, the Plaintiff had about eight to ten employees including Roselle and the Defendant.[20] The small team was successful; their general

---

[15] JX22; Pretrial Order ¶ 2; Roselle Tr. 23:17–19. The Defendant testified that "he remembered signing an employment agreement but did not know the contents of" it. Defendant Tr. 287:17–23.

[16] Roselle Tr. 10:10–14.

[17] JX31; Roselle Tr. 7:21–22.

[18] Roselle Tr. 15:21–23.

[19] Roselle Tr. 16:3–14.

[20] Roselle Tr. 13:8–9.

retention rate was 98 to 99 percent, and the most common reason clients left was their passing.[21] Altogether, the small team serviced a total of 300 households, catering towards high-net-worth clients and clients planning for retirement.[22]

As a financial advisory entity, the Plaintiff maintains clients' confidential information such as "[s]ocial security numbers, personal information, financial information, home addresses, contact information, family information," as well as information related to their investments.[23] It also maintains clients' investment strategies including risk tolerance, the amount of funds that the clients have with the Plaintiff, the fee that it charges, notes of prior meetings, and deliverables of meetings.[24] It monitors that information closely to prevent it from being publicly available.[25] In addition to client confidential information, the Plaintiff also maintains employee information.[26] To protect this confidential information, the Plaintiff uses multiple two-factor authenticated portals.[27]

---

[21] Roselle Tr. 54:16–20.

[22] Roselle Tr. 17:6–11.

[23] Roselle Tr. 17:16–22.

[24] Roselle Tr. 18:1–5.

[25] Roselle Tr. 18:9–11.

[26] Roselle Tr. 18:14–16.

[27] Roselle Tr. 18:17–19:1.

Additionally, for further protection of confidential information, employees are advised on confidentiality in, for example, the Plaintiff's employee handbook.[28] The employee handbook generally states that "[c]onfidentiality is important to [the Plaintiff] and [employee(s)] cannot breach that requirement."[29] Often times, "there is [also] an annual compliance training[] to reiterate the expectations."[30] The Plaintiff also provided a compliance training in 2024 specifically discussing the general approved communication methods maintaining a strict policy prohibiting texting from personal cell devices.[31]

On a day-to-day basis, the Plaintiff uses four management systems that store and protect its confidential information. The first system is a Customer Relationship Management System ("CRM") that allows the Plaintiff to track when employees access, delete, or download files.[32] The second is its SEI system, which is its main client portfolio or platform, which allows information to become immediately available should a client choose to switch from one advisor to another.[33] The third system is e-money, a financial planning portal.[34] The fourth and final system is

---

[28] Roselle Tr. 19:4–5; JX57.

[29] Roselle Tr. 20:15–18.

[30] JX46; Roselle Tr. 19:4–7; JX57.

[31] Roselle Tr. 19:18–20, 19:24–20:7; JX46.

[32] Roselle Tr. 22:15.

[33] JX37; Roselle Tr. 22:1–17; *see also* Roselle Tr. 86:1–4.

[34] Roselle Tr. 22:3.

Box.com ("Box") which is a file drive that keeps all of the Plaintiff's electronic files.[35] The Plaintiff is able to track when employees access, delete, or download files in Box.[36] Further, CRM, e-money, and Box are "[a]ll password protected and two-factor authentication enabled."[37]

## C.    Promotion Denied

Beginning in or around 2021 to 2022, the Defendant began asking about a promotion to partner; he believed five years of service was the base requirement and he was reaching that level.[38] But when he talked to Roselle in 2022, five years in, nothing changed.[39] As the years went on, the Defendant grew frustrated that he still had not made partner.[40] In 2024, he approached Roselle again.[41] During that conversation they discussed the Defendant having "a really productive first half of the year with new business revenue generation and such. And it was [Roselle] that

---

[35] Roselle Tr. 22:4–5.

[36] Roselle Tr. 21:15, 86:1–4.

[37] Roselle Tr. 22:8–9.

[38] Defendant Tr. 260:1–5.

[39] Defendant Tr. 260:6–14. (testifying that during his 2022 conversation with Roselle, the Defendant expressed his frustration that: "[Roselle] rolled out a program that was more or less accessible to every employee and the only requirement was five years of service. And that was really disappointing because in my mind partnership is exclusivity, and you really extend that to an individual that's worthy to be a partner.").

[40] *See* Roselle Tr. 53:14–20.

[41] Defendant Tr. 260:15–17.

brough the conversation of partnership back in play."[42] But, again, the conversation did not lead to partnership or even a clear path in that direction.

The Defendant continued to inquire throughout 2024.[43] But, to his dismay, rather than being promoted, he was demoted.[44] And, in late 2024, Roselle informed the Defendant that he would not be able to continue having partner conversations, because he had signed a non-disclosure agreement in connection with a potential sale of the Plaintiff.[45] To the Defendant, a potential or impending sale, when he had no equity in the Plaintiff, was a big factor in his ultimate decision to leave (in addition to family updates).[46] He testified: "because I had no equity, no skin in the game, you know, even if I'm well-compensated now, whoever acquires us could decide that I make too much or whatever. And I didn't have control."[47] But for Roselle the Defendant was not the right fit for a potential partner; he explained he wanted "someone who was able to take on management responsibility, strategy responsibility, client acquisition responsibility and advisory responsibility. While

---

[42] Defendant Tr. 260:18–24.

[43] Defendant Tr. 261:2–3.

[44] Roselle Tr. 54:2–4.

[45] Defendant Tr. 261:4–8.

[46] Defendant Tr. 261 9–18; 261:20–24. (testifying that the time, the possible sale of the Plaintiff and these conversations with Roselle "all happened just as [he] found news that [he was] having twins. And so, the lack of certainty as what [the Plaintiff] was going to look like in the future was concerning").

[47] Defendant Tr. 262:1–4.

[the Defendant] was excelling in an advisory area, he was not in others."[48] Ultimately, Roselle decided not to promote the Defendant to partner.

### D.    The Potential Acquisition

The potential acquisition that caused the Defendant concern was with AssuredPartners ("Assured").[49] Sometime in 2024, the Plaintiff was exploring a transaction with Assured, which conducted a valuation of the Plaintiff in Q4 2024.[50] Justin Callaham, a former president and broker dealer for Assured, played a significant role in the valuation and testified as to that valuation as an expert witness at trial.[51]

Assured was looking at the Plaintiff as a potential target to join its firm; to value it, Assured reviewed the Plaintiff's investment advisory agreements and conducted a broad analysis of its contractual obligations to determine expenses.[52] It then determined the Plaintiff's EBITDA, and applied a market-level multiple to that EBITDA to determine the Plaintiff's value.[53] To determine that market-based multiple, Assured used its judgment to determine what the Plaintiff would be worth

---

[48] Roselle Tr. 54:5–10.

[49] Roselle Tr. 53:1–4.

[50] Roselle Tr. 52:22–24; JX6; *see also* Roselle Tr. 53:6–7.

[51] Callaham Tr. 156:10–13. Callaham's expertise and involvement in the Assured valuation is not in dispute.

[52] Callaham Tr. 157:3–11.

[53] Callaham Tr. 157:3–11.

in an open-market and open-bidding process; looking to get to the fair market value of the business.[54] Ultimately, Assured valued the Plaintiff at $10,655,511.[55] Following, and relying upon, this valuation, Assured made an offer to Roselle, which led to a letter of intent.[56] The offer was not accepted.

## E.    The Departure

Although the Assured transaction fizzled, the Defendant's doubts about his future with the Plaintiff remained. Seeking more security, the Defendant looked elsewhere and, ultimately, found a new home with Cypress Financial Planning ("Cypress").

The Cypress move was in the works for some time. The Defendant initially looked to his Cypress connection, Jeff Jones, as a "mentor" of sorts. Those conservations morphed to include more direct talk of the Defendant's desire to make a move, after which Jones interviewed and vetted the Defendant.[57] They discussed his compensation and the possibility of him bringing clients to Cypress from the Plaintiff. Jones considered this a common exercise when hiring a new advisor at

---

[54] Callaham Tr. 162:3–11.

[55] Callaham Tr. 161:10–15; JX6.

[56] Callaham Tr. 161:6–9.

[57] Jones Tr. 237:7–15 (explaining that "in the weeks leading up to March 29, 2024, [the Defendant], myself, and Mr. Ruoff had had conversations that shifted from just purely being mentor and a little more detached to ones that seriously contemplated the thought of [the Defendant] joining Cypress.").

Cypress, aimed at getting an understating as to the "size of the clientele, the revenue that could potentially be generated, and the probability that a client would end up becoming a client of Cypress."[58]

During this interview process, the Defendant shared a spreadsheet with Cypress that had potential revenue data.[59] The spreadsheet disclosed client assets under management, revenue, and fees assessed by the Plaintiff.[60] In the spreadsheet, the Defendant also estimated the likelihood that he would be able to bring over each of the listed clients to Cypress.[61] Although the spreadsheet did not identify any of the Plaintiff's customers by name, the Defendant admitted that Cypress, through him, could connect some of the figures on the chart to the Plaintiff's client names.[62]

Relying upon the Defendant's representations in the spreadsheet, on March 29, 2024, Cypress sent the Defendant an offer letter with a flexible start date.[63] The

---

[58] Jones Tr. 230:10–17.

[59] Jones Tr. 229:15–18. *See* JX013; JX003; Jones Tr. 230:3–6 (testifying as to not recalling if he asked the Defendant to offer the excel sheet). *See also* Roselle Tr. 46:6–10 (testifying that the spreadsheet was used to determine the likelihood of the Plaintiff's clients following the Defendant to a new employer, which was then used to determine his compensation at Cypress).

[60] JX13.

[61] Defendant Tr. 290:11–15. The Defendant was still an employee of the Plaintiff when he provided the spreadsheet and was not authorized to disclose any of the information to a third party. Roselle Tr. 49:22–24.

[62] Defendant Tr. 293:19–22.

[63] JX62; Defendant Tr. 314:12–15.

Defendant was offered a base draw of $140,000.00, subject to payback or increase depending on the business the Defendant brought in.[64]

It would be nearly a year before the Defendant accepted that offer. Per the Defendant and his wife, he struggled with deciding to accept the offer and leave the Plaintiff. But he eventually did so on March 14, 2025.[65] The same day, the Defendant emailed Roselle resigning from his position at the Plaintiff, "effective immediately."[66] At the time, the Defendant knew Roselle was in Europe for his daughter's senior trip.[67] But the Defendant testified that he had no ill intent and chose the resignation date because it "coincided with when the meetings for that quarter ended[.]"[68]

Roselle was initially thankful that the Defendant had waited until after those meetings. Upon receiving the resignation, Roselle called the Defendant and told him that he was appreciated and thanked him for staying until the end of the annual

---

[64] JX52. *See also* Jones Tr. 238:14–18 (explaining that the Defendant's "base amount is $140,000. But that draw could be set higher if [the Defendant] was able to bring over clients from [the Plaintiff]. And that draw was also subject to being paid back to the extent that it exceeded what [the Plaintiff's] normal compensation model was."). *See also* JX63.

[65] JX80.

[66] Pretrial Order ¶ 10; *See* JX79.

[67] Defendant Tr. 297:2–4; Roselle Tr. 28:22–29:12 (explaining that the trip was on his calendar and that "[a]ll company employees have access to each other's calendars so if a client calls or needs anything, that we know who is going to pick it up.")

[68] Defendant Tr. 279:6–12.

review for that quarter.[69] That gratitude changed, though, when Roselle learned what the Defendant did simultaneously with his resignation.

### E.    The Announcement Cards

Although the Defendant and his wife testified that he decided to leave the Plaintiff just minutes before he sent his resignation email, they already had announcement cards advertising his new employment created and ready for mailing.[70] The front side of the announcement card stated, "We are pleased to announce James Whalen has joined the team" and contained Cypress' logo and contact information.[71] The back side of the announcement card was filled in with the recipient client's address and Cypress' return address.[72]

The template for the announcement card was one that Ruoff used when he left his previous employer to join Cypress.[73] Cypress provided the sample announcement card to the Defendant and his wife, who used the template to model their own announcement.[74] The Defendant's wife used Canva to make it "a little bit prettier"

---

[69] Defendant Tr. 265:24–266:13; Roselle Tr. 30:16–24.

[70] *See* JX86.

[71] *Id.*

[72] *Id.*; Defendant Tr. 298:6–8; Roselle Tr. 33:13–18.

[73]Jones Tr. 232:9–12 (explaining that the announcement card he provided to the Defendant's family was used by Kurt Ruoff, a partner at Cypress, when he left his previous employer; Ruoff sent the announcement card and then followed up with a phone call.)

[74] Alexa Testa Tr. 195:13–19.

13

and placed an order through FedEx the Sunday before the Defendant resigned from the Plaintiff.[75] The Defendant's family paid for the cards,[76] and once they were ready, the Defendant's wife picked them up from FedEx,[77] and took them to her mother, who addressed them and sent them out.[78] The Defendant had already given his mother-in-law the client information approximately one or two days before she sent them out.[79] With this planning and coordination, the Defendant resigned from the Plaintiff, mailed the cards, and signed on with Cypress all within one hour.

## F.    The Fallout

Roselle did not initially suspect any malintent or untoward conduct in the Defendant's resignation. But the Defendant's departure was unique; besides the Defendant, all past advisors of the Plaintiff had given notice before resigning,[80] and at no point prior to his resignation had the Defendant requested or negotiated to take any clients with him.[81] Unaware of the announcement cards, Roselle started to send

---

[75] Alexa Testa Tr. 194:20–195:1, 196:18–22.

[76] Alexa Testa Tr. 196:4–6.

[77] Alexa Testa Tr. 195:23–196:3.

[78] Maria Testa Tr. 199:8–11; JX112 Ex. B.

[79] Maria Testa Tr. 200:12–18. *See also* Maria Testa Tr. 203:17–20 (testifying that she did not transmit the customers names to Cypress nor was never asked by anyone to send them to Cypress.)

[80] Roselle Tr. 29:13–15. *But see* Defendant Tr. 267:11–21 (testifying that in his 15 years in the industry he never heard the phrase "customary notice" for when an advisor resigns.)

[81] Roselle Tr. 27:10–13. This was different than, for example, the departure of Jeff Kaczmarczyk, a past advisor at the Plaintiff who negotiated which clients he would take

14

emails to clients one by one to ensure that they were aware of the Defendant's departure.[82]

Roselle first learned about the cards when Robert Pedigo, a client of the Plaintiff's since 2008,[83] called him the Monday after the Defendant's resignation.[84] Pedigo had received the announcement card in the mail,[85] and took issue with it because, in his view, the Defendant "obviously sent the mailing and wanted to try to solicit business."[86] After he received the card, Pedigo called the Defendant and when he did not answer, he left a voice message and called Roselle.[87] He wanted Roselle to be aware of the card and of the Defendant's activities.[88] After the call, he also sent Roselle a picture of the card.[89] Sometime thereafter, the Defendant returned Pedigo's call and told him that he "needed to do what was best for him and his family and he

---

with him before leaving. Roselle Tr. 27:18–21; Roselle Tr. 96:18–19. For about 6–7 weeks before Kaczmarczyk left the Plaintiff, he and Roselle worked on an agreement and discussed which clients he will be taking. Roselle Tr. 27:23–28:3. The Defendant was aware of these discussions. Roselle Tr. 28:7–11 (explaining that the Plaintiff "touched on [these discussions] in some of our company meetings and also [Mr. Kaczmarczyk] and [the Defendant] were pretty close.")

[82] Roselle Tr. 36:18–22; Roselle Tr. 90:3–9. *See* JX11.

[83] Pedigo Tr. 144:5–10; Pedigo Tr. 144:13–16.

[84] Roselle Tr. 31:8–17.

[85] Pedigo Tr. 145:24–146:6 (stating that he learned about the Defendant's departure for the first time when he received the announcement card in the mail.)

[86] Pedigo Tr. 146:24–147:4.

[87] Pedigo Tr. 147:13–20.

[88] Pedigo Tr. 148:2–3.

[89] Pedigo Tr. 146:7–21; JX86.

was moving to another financial place."[90] This did not assuage Pedigo's concerns and Roselle testified that other clients were confused, frustrated, and uncertain as to who their advisor was after receiving the card in the mail.[91]

The Defendant, on the other hand, testified that he sent the cards to alleviate any such confusion; contending it was industry standard of giving notice to clients when a fiduciary changes employment.[92] He further explained he wanted to be the first one to communicate to the clients that he had left the Plaintiff and he did not want Roselle or anyone at the Plaintiff to create a narrative of why he left.[93] Thus, after sending the cards, the Defendant also called between 30–40 of the Plaintiff's clients.[94] Those calls were to confirm that they received the card and to let them know that he had joined Cypress.[95]

---

[90] Pedigo Tr. 148:11–20.

[91] Roselle Tr. 34:23–35:8. *See* JX92 (email from a client to the Defendant asking is he is still with the Plaintiff); JX94 (email dated March 17 from the Plaintiff's client asking if the Defendant was leaving the firm).

[92] Defendant Tr. 281:5–16.

[93] Defendant Tr. 297:5–15.

[94] Defendant Tr. 282:19–22,294:4–16.

[95] Pretrial Order ¶ 15. The Defendant got this contact information from his personal cellphone; he explained that, despite the Plaintiff's prohibition on keeping client contact information on personal devices, Roselle Tr. 32:3–6, he stored client contact information on his personal cellphone. Defendant Tr. 310:15–17.

On March 18, 2025, the Plaintiff's counsel sent a cease and desist letter to the Defendant and Cypress.[96] Cypress retained counsel and responded to the letter.[97] The Defendant then deleted all of the Plaintiff's files from his Google Drive other than his performance reviews,[98] and responded to the letter through counsel.[99] After he received the letter, the Defendant did not initiate contact with any of the Plaintiff's clients; he would only respond when they contacted him.[100]

Once Roselle learned of the cards and file downloads, the Defendant began an internal investigation.[101] The investigation uncovered, in the Plaintiff's eyes, concerning activity in the Box. Up until the day the Defendant left the Plaintiff, he maintained personal files the Box.[102] This was after the September 2024 notification to the Defendant that he was a "managed user" which meant that his activity would be "monitored or tracked[.]"[103] But, just before resigning, the Defendant copied

---

[96] Pretrial Order ¶ 16; JX112 Ex. C–D.

[97] Jones Tr. 218:7–12; Roselle Tr. 139:11–14.

[98] Defendant Tr. 271:16–20.

[99] Roselle Tr. 139:15–17.

[100] Defendant Tr. 295:4–7. But the Defendant did send more announcement cards to his family, friends, and neighbors. Defendant Tr. 270:9–18. *See also* Roselle Tr. 123:24–124:9 (stating that he was not aware that the Defendant had sent out announcement cards to family, friends, and neighbors prior to trial); Defendant Tr. 30:13–21 (confirming the Defendant did not provide a list or receipts for the mailings to these people in discovery).

[101] Roselle Tr. 37:5–8, 38:18–22. Roselle contacted Tom Spence and Kelly Wilson to help conduct the investigation. Roselle Tr. 37:11–21.

[102] Defendant Tr. 305:23–306:2. *See* JX126.

[103] Defendant Tr. 272:7–16.

client files from the Box system to his Google Drive.[104] And, fifteen minutes prior to his resignation, the Defendant downloaded the Plaintiff's password file which contained the passwords for all the Plaintiff's technology for all its employees.[105] The investigation ultimately led to this lawsuit and awaits its results.

While this case was pending, on April 14, 2025, the Plaintiff filed a U5 form addressing the Defendant's departure (the "Second U5").[106] In the Second U5, the Plaintiff disclosed that "[a]n internal review is ongoing. Certified letters were sent to existing clients indicating the employee's new employer and were postmarked on the same day the resignation was received. This timing suggests that confidential client information may have been sent to another firm during the employee's tenure."[107] Although notified of its filing, Cypress did not take any negative employment action against the Defendant based on the Second U5.[108]

---

[104] Defendant Tr. 308:10–12; JX144 Resp. 33.

[105] Roselle Tr. 45:20–46:12; *See* JX126; *See also* Roselle Tr. 137:11–16 (explaining that nothing regarding the meeting with clients on March 11, 2025, would have led the Defendant to download the Plaintiff's passwords). Reacting to the fallout, Roselle let his frustration show in an email to Spence. Roselle Tr. 38:10–15 (testifying that he was emotional when he wrote the email, but he did not allow the email to affect the internal investigation). *See also* Roselle Tr. 95:13–16 (admitting to telling Spence that he wanted to "bury the Mfer in as many ways as possible."). *See* JX109. Roselle vented to his friend, frustrated that the Defendant appeared to be stealing from him. Roselle Tr. 97:18–21 (testifying that he was referring to the Defendant's violation of the non-solicitation agreement when he said "The theft is unreal"). *See also* JX100.

[106] JX121; Roselle Tr. 98:24–99:1.

[107] JX121 at 5 ¶ 3.

[108] Jones Tr. 247:20–22.

18

I learned at trial that the Defendant is still settling in at Cypress and did not yet, as of trial, have a full load.[109] But some of the Plaintiff's clients have moved with him. After the Defendant's resignation, there was a sudden increase in client departures from the Plaintiff; more than it had ever encountered from years of operation.[110] Altogether, since joining Cypress, the Defendant has secured about fifteen clients with past associations with the Plaintiff.[111] All of these clients had been with the Plaintiff for at least three years prior to leaving, and they all left to join Cypress after receiving the Defendant's announcement card.[112]

---

[109] A "full load" of clients for an advisor at Cypress is between 75 and 100 clients. Jones Tr. 245:4–9.

[110] Roselle Tr. 54:21–24.

[111] Jones Tr. 244:6–12; Pretrial Order ¶ 17; JX144 at Resp. 28 ("Since March 14, 2025, the following clients have moved their accounts from [the Plaintiff] to Cypress: Desiree Anderson, Holly Melzer & Charles Green, Margaret Hinton, John Krawczyck, Robb & Silvia Lanham, Joseph & Lana Lark, Jennifer Linton, Christopher Long & Danielle Capece, William & Pam Morris, Lindsay Olson & Audrey Mason, Michael Schauber, Carl & Pam Stroud, and James & Linda Whalen.").

[112] Roselle Tr. 58:11–20. *See* JX7.

Several times during trial, the Defendant raised the issue of the "Broker Protocol." The Broker Protocol is "an agreement that investment firms can choose to join or not that sets some guidelines where a departing employee is allowed to take a very limited amount of client information to a new firm and not be subjected to litigation, even if that is in conflict with any type of agreement that they have signed with that firm." Jones Tr. 66:7–13. For the Broker Protocol to apply both firms need to be a member of the protocol. Jones Tr. 252:14–19. That protocol does not to apply here as neither Cypress nor the Plaintiff were members of the protocol at the time of trial or alleged breach. *See* Jones Tr. 219:20–24; Roselle Tr. 134:11–16. Nor does the protocol supersede valid restrictive covenants.

## II. PROCEDURAL POSTURE

The Plaintiff initiated this action on April 3, 2025.[113] In its complaint, the Plaintiff pled three counts for: (1) breach of contract; (II) breach of fiduciary duty; and (III) violation of the Delaware Uniform Trade Secret Act ("DUTSA").[114]

With its complaint, the Plaintiff also filed a motion for a temporary restraining order and a motion to expedite.[115] Vice Chancellor Laster heard the motions, which the Defendant contested, on April 15, 2025.[116] The Vice Chancellor denied the temporary restraining order, but granted the motion to expedite with modifications.[117] Specifically, the Vice Chancellor directed the parties to work on a schedule for a preliminary injunction hearing within 45 days. Shortly thereafter, however, the Plaintiff withdrew its request for preliminary injunctive relief.[118] Completing the pleadings, the Defendant filed his answer and counterclaim for defamation on April 21, 2025,[119] and the Plaintiff responded on May 12, 2025.[120]

---

[113] D.I.1.

[114] *Id.*

[115] *Id.*

[116] D.I. 17.

[117] D.I. 15, 16.

[118] D.I. 20.

[119] D.I. 18, 91; JX123.

[120] D.I. 21.

On May 30, 2025, this action was reassigned to me.[121] I originally scheduled trial for November 12, 2025, but I moved that date to January 9, 2026.[122] Then came the Plaintiff's discovery motions, which I heard and granted on December 30, 2025, requiring more from the Defendant, extending discovery deadlines appropriately, and cancelling the January 2026 trial.[123] I promptly rescheduled trial for February 6, 2026.[124]

Trial went forward as scheduled and the parties waived post-trial briefing, choosing to rely on their pretrial briefs, pretrial stipulation, and trial record.[125] The parties further stipulated, in their pretrial stipulation, to present this action to me for a final decision, waiving the right to further judicial review at the Chancery level and stipulating to a direct appeal to the Delaware Supreme Court.[126]

## III.   ANALYSIS

The primary issue pending before me is whether the Defendant breached the Agreement, particularly his confidentiality and non-solicitation restrictions.[127] He did. He also misappropriated the Plaintiff's confidential information in violation of

---

[121] D.I. 22.

[122] *See* D.I. 26-35.

[123] *See* D.I. 70.

[124] D.I. 71.

[125] D.I. 94.

[126] Pretrial Order at ¶ 57.

[127] D.I. 82, 84.

DUTSA. But the Plaintiff fell short of demonstrating that the Defendant owed and breached additional fiduciary duties. And I conclude that the Defendant's counterclaim for defamation fails, because the statements at issue were true. The Plaintiff is entitled to consequential damages, costs as the prevailing party, attorneys' fees under the Agreement, and injunctive relief. I address these matters in turn.

## A.    The Plaintiff proved its breach of contract claim.

The Plaintiff's primary claim is that the Defendant breached the Agreement. To prove a breach of contract under Delaware law, the Plaintiff must show: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages.[128] The Plaintiff must prove those elements by a preponderance of the evidence.[129]

The Defendant initially challenges the Plaintiff's ability to invoke the Agreement, arguing that it was not properly assigned to the Plaintiff from Marathon, the predecessor entity. I disagree.

The Agreement was executed by the Defendant and Marathon "collectively with its affiliates, parents, successors and subsidiaries," which were collectively defined as the "Employer."[130] In Section 4, the parties further agreed that "Employer

---

[128] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[129] *Desktop Metal, Inc. v. Nano Dimension Ltd.*, 2020 WL 904521, at *22 (Del. Ch. Mar. 24, 2025).

[130] JX22.

and any affiliate or successor of Employer (including, without limitation, [the Plaintiff]) shall have standing to enforce this Agreement."[131] These provisions track Delaware law recognizing the assignability of restrictive covenants "so long as the assignee engages in the same business as the assignor."[132] "While personal service contracts usually may not be assigned, noncompete agreements and other restrictive covenants exist *for the benefit of the business* and not the individual parties. Thus, the business, whether as assignee or assignor, should enjoy that benefit by having the power to enforce such restrictive covenants."[133] Such assignment is generally effective when the owner of that right "manifest[s] his intention to make a present transfer of the right without any further action by him or by the obligor."[134]

Here, the Agreement expressly included Marathon's successors as part of the collective contracting party and future enforcer. The parties manifested their agreement that the rights and interests would transfer thereto, without further confirmatory action. Thus, when Marathon reorganized without changing its business, the Agreement went with it and was not invalidated by Marathon's

---

[131] *Id.*

[132] *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *12 (Del. Ch. Jan. 29, 2010).

[133] *Id.* at *11 (emphasis in original) (citations omitted).

[134] *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, 1999 WL 160148 at *5 n.16 (Del. Ch. Mar. 11, 1999) (citing RESTATEMENT (SECOND) OF CONTRACTS § 317(1)).

cancellation. The Agreement was properly assigned to the Plaintiff as a successor entity when Marathon reorganized.[135]

Having determined that the Agreement was properly assigned, I turn now to the Agreement itself and the Defendant's subsequent breach. The Plaintiff argues that the Defendant breached Sections 3(a), (c), and (e), which in turn bar the Defendant from using the Plaintiff's client information, soliciting the Plaintiff's clients, and managing or training any other person in doing either. The Defendant argues that he did not use any client information and the non-solicit is unenforceable under Delaware law; without either, he argues that he could not violate Section 3(e). I address these in turn.

### 1. The Defendant used the Plaintiff's "Client Information," and managed his wife and mother-in-law in doing the same.

Under Section 3(a) of the Agreement, the Defendant could not "copy, disseminate, download, upload, forward, transmit, use or modify Client Information, Employer Information, lists or contact information."[136] Additionally, when the Defendant concluded his employment with the Plaintiff, he was required to "return forthwith to the Employer any and all such records (originals and copies) he may

---

[135] In so holding, I give no weight to the outside authority on which the Defendant relies. This Court has spoken on and decided the issue of assignability for restrictive covenants, and that precedent applies here.

[136] JX22 § 3(a).

have in his possession and . . . not retain copies thereof except as he may be required to do so by law . . . or otherwise with the express written consent of the Employer."[137] And he could not, under Section 3(e), manage or train anyone else to use or maintain such information. The Agreement defines "Client information" as "all the files and records . . . regarding Clients, including but not limited to financial, banking, investment, debt, personal, business, tax, audit and corporate information, and the like."[138]

This restriction is unambiguous; it bars the Defendant from maintaining and using information about the Plaintiff's clients, or working through others to do so. The Defendant did just that; admitting to retaining customer contact information, including home addresses, on his cell phone.[139] The Defendant also downloaded information from the Plaintiff's shared drives. He attempted to defend this conduct by arguing that the information was downloaded to assist with his annual employment review and client meetings.[140] But his last annual review was conducted on December 23, 2024, and the Defendant last met with clients on March 11, 2025.[141] Yet well after these dates, the Defendant continued to download the Plaintiff's

---

[137] *Id.*

[138] JX22 § 2.

[139] JX144 at 15; Defendant Tr. 310:1–18.

[140] *See* JX 144 at Resp. 33.

[141] Roselle Tr. 42:5–12; Defendant Tr. 313:6–8.

confidential files. In fact, just 15 minutes before the Defendant sent his resignation email, he downloaded the Plaintiff's password files.[142]

The Defendant also used the client information to help him get the Cypress job and to solicit the Plaintiff's clients to join him at that new firm. First, he compiled a list of the clients he serviced at the Plaintiff, the revenue those clients brought into the Plaintiff, and the client's assets under management.[143] He then shared that information with Cypress during the interview process.[144] Then, after he announced his departure, he used client information in his possession, with the held of his wife and mother-in-law, to send an announcement about his change in firm. The Defendant violated Sections 3(a) and (e).

**2.     The non-solicit is enforceable and the Defendant violated it.**

The Defendant also violated the non-solicit in Section 3(c), which I find enforceable. Section 3(c), reads in relevant part:

> Employee agrees that during employment and for a period of three years following Separation, he shall not directly or indirectly, for his benefit or the benefit of any other person, entity, or organization, solicit, sell or service business from, to or for any Client who was a Client at the time of Separation. Employee acknowledges that the restriction against solicitation "directly or indirectly" as provided herein means that he may not assist, authorize, or otherwise empower any other

---

[142] JX126. That file contains passwords for every employee of the Plaintiff, including Roselle. Roselle Tr. 46:6–10.

[143] JX13. Unsurprisingly, client revenue and assets under management is considered highly confidential by the Plaintiff. Roselle Tr. 49:10–21.

[144] Jones Tr. 229:15–18.

individual, entity or organization, be that party an employer, employee, partner, associate, consultant or unrelated person, in the solicitation, sale or service of business form a Client or provide any information of assistance that would help such party in soliciting business from a Client. Employee specifically acknowledges and agrees that after three years following Separation, the prohibitions in this paragraph will remain in effect unless contrary action is in the best interest of a Client.[145]

A restrictive covenant like the non-solicit in Section 3(c) is enforceable if: "(1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities."[146] Here, the Defendant argues the non-solicit is not reasonable in scope and duration because of the final sentence allowing for an extension of the temporal limitation. I disagree that this renders the restriction unenforceable.

The Defendant takes issue with the sentence that states: "[e]mployee specifically acknowledges and agrees that after three years following Separation, the prohibitions in this paragraph will remain in effect unless contrary action is in the best interest of a Client."[147] But "Delaware courts evaluate restrictive covenants holistically and in context."[148] Looking at the meat of Section 3(c), I conclude it is

---

[145] JX22 § 3(c).

[146] *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

[147] JX22 § 3(c).

[148] *Cleveland Integrity Services, LLC v. Byers*, 2025 WL 658369, at *8 (Del. Ch. Feb. 28, 2025).

reasonable. The initial three-year restriction on client solicitation falls well within the inner bounds of what Delaware courts have determined as enforceable.[149] It seems even more reasonable when considering that both Section 3(c) and the Agreement as a whole do not inhibit the Defendant's ability to work in his field.[150] Nor is it ambiguous. A three-year bar on soliciting the Plaintiff's hard earned customer base is clear and reasonable. I reject the Defendant's argument that the last sentence of Section 3(c) renders the larger non-solicit indefinite. At worst, it is an add-on that may be segregated from the enforceable scope.

Not only is Section 3(c) reasonable, but the Defendant breached it. The factual record developed at trial supports the conclusion that the Defendant directly or indirectly solicited the Plaintiff's clients. The same day he resigned from the Plaintiff, the Defendant mailed out announcement cards to the Plaintiff's clients.[151] One prominent client felt it was obvious that the Defendant was trying to solicit his business.[152] And with good reason. The mailing stated "Welcome to our team" next to the client's name and address.[153] The Defendant further testified to calling "as

---

[149] *See, e.g., Kan-Di-Ki, LLC*, 2015 WL 4503210, at *19 n.233 (compiling cases); *Gener8, LLC v. Castanon*, 2023 WL 6381635 (Del. Ch. Sept. 29, 2023) (enforcing a non-solicitation clause with a period of five years).

[150] *See Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 691 (Del. 2024).

[151] JX83; JX86; Pretrial Order ¶ 11.

[152] Pedigo Tr. 147:3–4.

[153] JX86.

many [of the Plaintiff's] clients as [he] could before [he] received the cease and desist."[154] The Defendant had the opportunity to identify any clients to be exempt from the Agreement's restrictions under Section 3(e).[155] But he failed to do so, and instead reached out on his own behalf.

The trial record confirmed that the Defendant contacted over forty of the Plaintiff's clients through mailing and phone calls and attempted to bring them to Cypress. That was the expectation when he joined Cypress, and he followed through. His actions amount to solicitation in clear violation of Section 3(c) in the Agreement.

## B. The Defendant misappropriated trade secrets under DUTSA.

The Plaintiff next asserts that the Defendant misappropriated its client information in violation of DUTSA. Trade secrets, under Delaware law, are a protectable interest.[156] The Plaintiff must prove the following by a preponderance of the evidence: (1) the existence of a trade secret as defined in the statute; (2) communication of the secret by plaintiff to the defendant; (3) such communication was pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information has been improperly (*e.g.*, in

---

[154] Defendant Tr. 282:12–13.

[155] JX22 § 3(e).

[156] *Great Am. Opportunities, Inc.*, 2010 WL 338219, at *16.

breach of that understanding) used or disclosed by the defendant to the injury of the plaintiff.[157]

The Defendant contests that the client information at issue was a trade secret. To prove that it is a trade secret exists, the Plaintiff needed to demonstrate "(1) that it possessed information sufficiently secret and valuable to give it a competitive advantage and (2) that it took reasonable efforts to maintain the secrecy of that information."[158] That information must "[derive] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means[.]"[159] A potential trade secret "derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money."[160]

Under this framework, the customer contact information is certainly a trade secret. The lists and customer contact information included names, contact numbers, home addresses, and assets under management.[161] The Defendant argued that this information cannot constitute a trade secret because telephone numbers and

---

[157] *Nucar Consulting, Inc. v. Doyle*, 2005 WL 820706, at *5 (Del. Ch. Apr. 5, 2005) (quoting *Total Care Physicians, P.A., v. O'Hara*, 2002 WL 31667901, at *4 (Del. Super. Oct. 29, 2002)). *See also* 6 *Del. C.* § 2001 *et seq.*

[158] *Great Am. Opportunities, Inc.*, 2010 WL 338219, at *16.

[159] 6 *Del. C.* § 2001(4).

[160] *Del. Express Shuttle, Inc.*, 2002 WL 31458243, at *18.

[161] JX13; JX3; JX126.

addresses are public information. But the client lists, including the ones that the Defendant admitted to downloading to his personal drive, include social security numbers, financial information, family information, and information related to their investment strategies.[162] That bespoke information is not publicly available.[163]

And the Plaintiff took steps to protect the confidentiality of its client lists and information. Most notably, that information was specifically referenced in the Agreement and similar employee restrictive covenants,[164] as well as its employee handbook and compliance trainings.[165] It was also password protected and required two-factor authentication to access.[166] Based on that evidence, the Plaintiff made reasonable efforts to maintain the secrecy of its customer information.

The client list and the information within also derive independent economic value. The Plaintiff spent considerable time and effort in cultivating its client base, assessing and planning their finances, and determining the fees to charge them. The client information at issue qualifies as trade secrets under 6 *Del. C.* § 2001.

---

[162] Roselle Tr. 17:16–22. The investment information included risk tolerance assessments, the fees the Plaintiff charges the clients, notes of prior meetings, and similar planning information. Roselle Tr. 18:1–5.

[163] I also reject the Defendant's argument that client contact information like phone number and home address is publicly available through Google searches. The contact information for its clients, as compiled by the Plaintiff during the course of its business, is not publicly available.

[164] JX22.

[165] JX57 at 32; JX46.

[166] Roselle Tr. 18:17–19:7.

31

The Defendant misappropriated those trade secrets. The Defendant received confidential client information through his employment, and receipt of that information was expressly conditioned on it being kept confidential.[167] Despite that condition, the Defendant used the information to prepare and send his announcement cards.[168] He also shared confidential client information like assets under management and fees with Cypress while he negotiated his next employment.[169] And he downloaded significant confidential client information leading up to his resignation, including client files and templates that were property of the Plaintiff.[170] Through this activity, the Defendant misappropriated trade secrets under DUTSA.

### C. The Plaintiff failed to articulate any fiduciary duty breached by the Defendant.

The Plaintiff's final claim is that the Defendant breached his fiduciary duty to the Plaintiff. For a breach of fiduciary duty claim, the Plaintiff needed to prove that the Defendant owed and breached duties.[171] The Plaintiff argues that the Defendant

---

[167] JX22.

[168] JX2; JX86.

[169] JX3; JX62; JX63.

[170] JX126; JX127.

[171] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010) ("A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty.").

owed a duty not to maintain and use the Plaintiff's confidential information and breached that duty.

This fiduciary duty claim reflects the type of bootstrapping this Court eschews. "Delaware law does not permit a plaintiff to 'bootstrap' a contract claim into a fiduciary duty claim by alleging that the contractual breach was disloyal. "[W]here a dispute arises from obligations that are expressly addressed by contract," the contract claim is typically the only one that can proceed."[172] Here, the fiduciary claim is parallel to the contract claim, lacking any additional or broader scope of facts upon which it would be appropriate to consider an independent fiduciary claim or different potential remedies.[173]

---

[172] *Mckenzie v. Bdo USA, P.C.*, 2026 WL 191010, at *7 (Del. Ch. Jan. 26, 2026) (citations omitted).

[173] *Id.*

## D. The Defendant's defamation counterclaim fails.[174]

The Defendant argues that the Second U5 is defamatory.[175] To be successful on a defamation claim, the Defendant was required to prove "(i) [the Plaintiff] made a defamatory statement, (ii) concerning [the Defendant], (iii) the statement was published, and (iv) a third party would understand the character of the communication as defamatory."[176]

"A statement is defamatory when it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[177] But "truth is an absolute defense to a defamation

---

[174] This Court's jurisdiction over defamation claims is murky. As Judge Winston addressed in *Cytotheryx, Inc. v. Castle Creek Biosciences, Inc.*, 2025 WL 3142373, at *2 (Del. Ch. Nov. 10, 2025), this Court declared in *Perlman v. Vox Media, Inc.* that it "in all instances, lacks subject matter jurisdiction to adjudicate" certain elements of defamation. 2019 WL 2647520, at *1 (Del. Ch. June 27, 2019) (citing *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017)). Yet after *Perlman*, this Court invoked the clean-up doctrine to adjudicate a defamation claim in *Laser Tone Bus. Sys., LLC v. Del. Micro-Computer LLC*, 2019 WL 6726305, at *13-15 & n.177 (Del. Ch. Nov. 27, 2019). *See also Invictus Glob. Mgmt., LLC v. Corbin Capital P'rs, L.P.*, 2025 WL 2419577, at *20 (Del. Super. Aug. 21, 2025) (explaining that the Court of Chancery has "in its discretion" exercised the clean-up doctrine "to hear defamation claims," and citing *Laser Tone*). Because the defamation claim here found its way to this Court through a compulsory counterclaim, I follow the lead of the Court in *Laser Tone* and retain jurisdiction through the clean-up doctrine. *Kraft v. Wisdom Trees Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016). *Compare Preston Hollow Cap. LLC v. Nuveen LLC*, 216 A.3d 1, 4 (Del. Ch. 2019) (declining to exercise jurisdiction over a defamation claim brought by the plaintiff) *with Laser Tone Bus. Sys., LLC*, 2019 WL 6726305, at *1 (exercising jurisdiction for compulsory counterclaims that included defamation).

[175] D.I. 18.

[176] *Agar v. Judy*, 151 A.3d 456, 470 (Del. Ch. 2017).

[177] *Cousins 8 v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022).

action."[178] As long as the statements in the Section U5 are "substantially true," the defamation claim must fail.[179]

Likewise, opinions are also protected.[180] The distinction between opinion and fact is significant, because "[w]hile allegations of specific criminal conduct generally cannot be protected as opinion, broad brush-stroked references to unethical conduct, even using terms normally understood to impute criminal acts, may be understood by the reasonable viewer as opinion."[181]

Here, both truth and opinion operate as an absolute defense to the Defendant's claim. In the Second U5, the Plaintiff was obligated to answer question 7B which asks: "[c]urrently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct?"[182] The Plaintiff answered in the affirmative, and provided the following description:

> The employee resigned effective immediately on 3/14. An internal review is ongoing. Certified letters were sent to existing clients indicating the employee's new employer and were postmarked on the same day that the resignation was received. This timing suggests that

---

[178] *Barker v. Huang*, 610 A.2d 1341, 1350 (Del. 1992).

[179] *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998).

[180] *Agar v. Judy*, 151 A.3d at 481 ("The First Amendment of the United States Constitution generally protects expressions of opinion.").

[181] *Id.*

[182] JX121 at 2.

confidential client information may have been sent to another firm during the employee's tenure.

The Defendant argues that the affirmative answer and explanation was defamatory and done maliciously with the specific intent to injure.[183] But by answering yes to question 7B, the Plaintiff truthfully represented that at the time of filing, the Defendant was under internal review for wrongful taking of property—client information. And the explanation provided is similarly truthful. The employee did resign effective immediately on March 14.[184] And when the Section U5 was filed on April 14, 2025, the Plaintiff was conducting an internal review.[185] By the Defendant's own admission, priority letters were sent to existing clients indicating his new employer, and those were postmarked on the same day the resignation was received.[186] Those are all completely truthful statements and the difference between priority and certified is immaterial.

Finally, the last sentence reflects the Plaintiff's opinion that confidential client information *may* have been sent to another firm during the Defendant's tenure. That opinion was based on information gained through the internal review. The Plaintiff opined that the timing of events suggests client information was sent. There is not a

---

[183] D.I. 18 ¶¶ 12–13.

[184] JX121; JX79.

[185] Roselle Tr. 62:23–63:4, 64:12–22.

[186] *See* JX 86; Defendant Tr. 293:23–294:3.

definitive or definite claim that it had. Regardless, the statement was ultimately true.[187]

Because the statement at issue was truthful, the first element of defamation has not been met. The analysis ends there. The statements in the Second U5 were truthful and opinion based, and as such, the Defendant's counterclaim fails.[188]

### E.     The Plaintiff is entitled to damages.

Having found the Defendant liable for breach of contract and violating DUTSA, I turn lastly to damages. For its claims, the Plaintiff must, by a preponderance of the evidence, prove the level of damages that resulted from the Defendant's wrongful behavior.[189]

---

[187] *See* JX144; Defendant Dep. 46:12–48:5, 83:14–85:5.

[188] In so holding, I decline to address the outside authority relied on by the Defendant. *See* D.I. 87 at 17–19. The Defendant points me to eleven unreported FINRA arbitration cases which speak to actual damages available for defamatory form U-5 disclosures. Because the statements in the Second U5 were truthful, there is no need to address this precedent that is persuasive authority at best.

[189] *See Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009) ("To succeed on its various claims against Defendants [including a claim of breach of fiduciary duty], Triton must prove liability by a preponderance of the evidence."); *Nucar Consulting, Inc.*, 2005 WL 820706, at *5 ("A plaintiff alleging misappropriation of a trade secret must prove its case by a preponderance of the evidence."); *Desktop Metal, Inc.*, 2020 WL 904521, at *22 ("The party asserting breach [of contract] bears the burden of proof and must meet that burden by a preponderance of the evidence.").

To show damages, the Plaintiff relied on the report prepared by Justin Callaham, LLM, its damages expert (the "Damages Report").[190] In the Damages Report, Callaham employed an identical methodology to that he used in his December 2024 business valuation of the Plaintiff. Specifically, he used an enterprise value impairment metric to measure the actual economic harm that resulted from eleven client households that followed the Defendant to Cypress.[191] When comparing the Damages Report to the 2024 valuation, Callaham noted that the departing households generated $179,265 in annual revenue during 2024.[192] He applied the Plaintiff's historical EBITDA margin of 38.8% to that lost revenue, which showed an annual lost EBITDA of $69,555.[193] Finally, he multiplied that figure by 11.00x, the same multiple used in the 2024 valuation, to produce damages of $765,103.00.[194] Essentially, the expert opined, if the Plaintiff sought to sell the firm now, the buyer would pay $765,103.00 less than it would have in December 2024, before the Defendant solicited clients.[195]

---

[190] JX146.

[191] *Id.* at 4.

[192] *Id.*

[193] *Id.*

[194] *Id.* That multiple "reflects market conditions, industry norms, and an all-cash acquisition structure, as well as the specific characteristics of [the Plaintiff's] client relationships as of December 2024." *Id.*

[195] Callaham's calculation excluded two clients: The Defendant's parents and a client who left the Plaintiff for independent reasons.

DUTSA allows a party to recover damages, including "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."[196] Neither the Plaintiff nor the Damages Report made any attempt to prove damages for unjust enrichment. Thus, for compensatory damages, I can only consider the direct damages from the Defendant's solicitation; the actual loss caused by the misappropriation.

With that said, I find the Damages Report a helpful guide. The report reasonably calculated the lost revenue from those eleven clients that the Defendant solicited. That lost revenue could also be seen as the actual damage that resulted from the misappropriation of client information. The Defendant took that information, gave it to a competitor, and the clients eventually moved to that competitor. Those damage figures are not speculative, they are concrete and attainable. Therefore, I adopt the report and award the Plaintiff the full lost enterprise value of $765,103.00. That figure is a principled, nonspeculative estimate of damages due to the Plaintiff.[197]

### D.   The Plaintiff is entitled to attorneys' fees and costs.

The Plaintiff also seeks costs, attorneys' fees, and both pre- and post-judgment interest. The Agreement has a fee-shifting provision, which provides that "if

---

[196] 6 *Del. C.* § 2003(a).

[197] *See Great Am. Opportunities, Inc.*, 2010 WL 338219, at *27.

Employer successfully enforces this Agreement, Employer shall be awarded its reasonable costs and attorneys' fees."[198] "When a contract contains a fee shifting provision, Delaware courts will enforce that provision."[199] The Plaintiff has successfully enforced the Agreement and is entitled to attorneys' fees. If the parties cannot agree, the Plaintiff shall submit an affidavit under Court of Chancery Rule 88.

The Plaintiff is also entitled to costs under Court of Chancery Rule 54(d), where "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main use or on *most* of her claims."[200] Here, the Plaintiff is the prevailing party, and fees should be shifted as such.

The Plaintiff is also entitled to prejudgment and post-judgment interest. "In Delaware, prejudgment interest is awarded as a matter of right. Such interest is to be computed from the date payment is due."[201] "Where damages do not accrue immediately upon breach, prejudgment interest is measured from the date on which

---

[198] JX22 § 4.

[199] *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 280 (Del. 2022).

[200] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

[201] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

the damages began to accrue."[202] I see no reason to depart from that routine practice, and I grant the Plaintiff prejudgment interest on its damages at the legal rate.[203]

Post-judgment interest is also awarded as a matter of right.[204] "Prejudgment interest is part of the 'judgment' and, as such, should be included in the amount on which post-judgment interest accrues."[205] The Plaintiff is awarded post-judgment interest at the legal rate on the combined amount of the damages award and the pre-judgment interest. Post-judgment interest, like prejudgment interest, will compound quarterly.

### E. Injunctive relief is also warranted.

Finally, the Plaintiff seeks injunctive relief, enjoining the Defendant from using or disclosing any of the Plaintiff's trade secrets or confidential information, disclosing the identities of its clients, and compelling the Defendant to return all such information that may still be in his possession. To be entitled to such relief, the Plaintiff must demonstrate: (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of equities weighs in favor of issuing the injunction.[206]

---

[202] *Vivint Solar, Inc. v. Lundberg*, 2024 WL 2755380, at *37 (Del. Ch. May 30, 2024).

[203] *See* 6 *Del. C.* § 2301(a).

[204] *See Noranda Aluminum Hldg. Corp. v. XL Ins. Am., Inc.*, 269 A.3d 974, 978 (Del. 2021).

[205] *NGL Energy P'rs LP v. LCT Cap., LLC*, 319 A.3d 335, 338 (Del. 2024).

[206] *Concord Steel, Inc. v. Wilm. Steel processing Co.*, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009).

That first element, actual success on the merits, is demonstrated by the analysis above. The Plaintiff has proven that the Defendant breached his non-solicitation and confidentiality restrictions and misappropriated trade secrets. In connection with the contractual disputes, the parties agreed that "any breach by [the Defendant] of this Agreement would cause [the Plaintiff] irreparable damage, and that no remedy available at law would be adequate for such a violation.[207] Further, "our law has consistently found a threat of irreparable injury in circumstances when a [restrictive covenant] is breached."[208] Based on the clear agreement between the parties that breaches of the Agreement would cause irreparable harm, and the factual record developed at trial as to the nature and extent of these breaches, I find that this requirement is also met.

Finally, I must consider whether the harm that a potential injunction would cause outweighs the benefits of granting the Plaintiff the injunction it seeks. The Agreement does not contain a non-compete clause. There is nothing preventing the Defendant from working in his field or providing for his family. He just may not do so by poaching the Plaintiff's clients. Meanwhile, the Plaintiff has a strong interest in protecting its book of business and maintaining client relationships. The balancing of the equities supports injunctive relief.

---

[207] JX22 at § 4.

[208] *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007).

For those reasons, I will grant the injunctive relief sought by the Plaintiff. The Defendant shall be enjoined from using or disclosing any of the Plaintiff's trade secrets or confidential information, and he must return all such information that may still be in his possession. The Defendant shall be required to submit an affidavit representing that those actions have been complete. I will also reinstate the Defendant's non-solicit for the full three-year period.

## IV.  CONCLUSION

For the reasons stated within, I conclude that the Plaintiff has proved its breach of contract and misappropriation of trade secrets claims. The Plaintiff's fiduciary duty claim, and the Defendant's counterclaim for defamation both fail. The Plaintiff is entitled to the damages and injunctive relief addressed herein, including shifted fees and costs. This ruling is a memorandum opinion subject to the same appellate process and review as the constitutional officers of this Court.